Henry K. Given, Transferee v. Commissioner. 801 Walnut Street, Incorporated, by Henry K. Given and Walter C. LaSalle, Trustees v. Commissioner. Walter C. LaSalle v. Commissioner.
Given v. Commissioner
Docket Nos. 45609-45611.
United States Tax Court
T.C. Memo 1955-39; 1955 Tax Ct. Memo LEXIS 299; 14 T.C.M. (CCH) 133; T.C.M. (RIA) 55039; February 15, 1955
Harry A. Hall, Esq., 431 Scarritt Building, Kansas City, Mo., and A. Henry Cuneo, C.P.A., for the petitioners. David Karsted, Esq., for the respondent. JOHNSON
Memorandum Findings of Fact and Opinion JOHNSON, Judge: The proceeding in Docket No. 45610 involves deficiencies and penalties determined against petitioner 801 Walnut Street, Incorporated, a dissolved corporation, as follows: Income Tax
50%
25% Penalty
Year
Deficiency
Penalty
Sec. 291(a)
1945
$1,847.21
$ 923.61
$ 461.80
1946
3,845.84
1,922.92
961.46
1-1 to 5-31,
1947
9,681.36
4,840.68
2,420.34
Declared Value Excess-Profits Tax
1945
$ 475.98
$ 237.99
$ 119.00
*300 The proceeding of each of the other petitioners involves liability as a transferee for the deficiencies and additions to tax of the corporation. The issues, in general, are whether income derived from the operation and/or sale of certain real estate is taxable to the corporation; whether the fraud and delinquency penalties were properly imposed, and whether the individuals are liable as transferees for any tax liability of the corporation. Findings of Fact Petitioner 801 Walnut Street, Incorporated, hereinafter referred to as the petitioner, was organized under the laws of Missouri on October 3, 1944, with an authorized capital consisting of 300 shares without par value, to own, manage, lease and sell real and personal property. Its principal place of business was in Kansas City, Missouri. Petitioner Henry K. Given, hereinafter referred to as "Given", and petitioner Walter C. LaSalle, hereinafter referred to as "LaSalle", are individuals residing in Kansas City. Of the authorized shares of stock of petitioner, 298 shares were issued to Given and one each to Harvey R. Given, his brother and a licensed real estate agent, and Gourley T. Gracey, an employee of Given, who were the *301 incorporators of petitioner. In about 1943 Given had a plan to contract for the acquisition of real property that could be purchased with a small down payment but take title in the name of a corporation. Funds for the purchase and operation of the properties were to be borrowed from Real Estate Bond and Share Corporation, a Missouri corporation organized on August 11, 1944, hereinafter referred to as "Bond & Share", whose stock had been sold for cash. Given held $10,000 face value of the stock, which was a controlling interest. Notes, secured by mortgages on properties acquired, were to be sold to investors. One-half of the common stock of the acquiring corporation was to be issued to Given, and the other half to the investors in proportion to the notes they had purchased. Operating profits were to be used first to pay off the notes and then for dividends on common stock. About 12 corporations were formed under the plan, including petitioner. On September 22, 1944, a contract was entered into by Bond & Share as agents for petitioner, designated as a corporation to be formed, for the Gumbel building, located at 801 Walnut Street, Kansas City. A resolution for the purchase of the *302 property was adopted by petitioner on October 5, 1944, and on October 18, 1944, title was conveyed to it by deed. A payment of $2,500 on the purchase price was made out of a loan of $3,000 by Bond & Share. On May 14, 1945, petitioner purchased two parcels of property located at 705-707 and 715-719 Main Street, and on June 7, 1945, the property located at 812 Main Street, all in Kansas City. A payment of $625 was made on the purchase price of the property at 812 Main Street and a note, secured by a deed of trust, was executed by petitioner for the balance due. Funds to purchase the properties were obtained from Bond & Share. None of the four properties so acquired by petitioner was rented. The Gumbel building was sold May 4, 1945, at a profit of $1,358. The 812 Main Street property was sold June 20, 1945, at a profit of $598, and two parcels in the 700 block of Main Street were sold June 21, 1945, and August 22, 1945, at a total profit of $1,300. Money obtained from Bond & Share to acquire the properties was repaid out of the proceeds of sale of the four properties. A short time after the repayments, Bond & Share was dissolved. Another property held in the name of petitioner was *303 the LaSalle building, situated in Kansas City. Interest in the acquisition of the property originated with LaSalle, who was engaged in the real estate mortgage business, and A. M. Wilson, an insurance agent. Thereafter Given and his brother Harvey and C. L. Bell became interested in the purchase of the building, and as a result, on May 22, 1945, Given submitted a written offer as president of Bond & Share to buy the property. Each of the five individuals was to have an equal interest in the property. The individuals never entered into a written agreement among themselves for the purchase of the property. On June 6, 1945, Given entered into a contract to purchase the property without disclosing in the instrument that he was acting for any other party. The contract provided for a down payment of $1,000, which was made by Given, and $6,000 on delivery of a deed, the remainder of the purchase price of $35,000 to be evidenced by a note secured by a first deed of trust on the property. Later Given suggested to some of the other individuals that title to the property be taken by petitioner to avoid complications that might arise in case a suit was filed against them or any of them died, *304 and they agreed to the plan. Wilson left the matter entirely to the other four individuals. It was decided that each party would contribute $1,750 in connection with the plan. Thereafter on June 11, 1945, the stockholders of petitioner adopted a resolution reading, in part, as follows: "Henry K. Given, President of the Corporation, reported that he had an opportunity to purchase property located at the Northeast Corner of 9th and Main, known as the LaSalle Building, for the sum of $35,000.00, from William Rockhill Nelson Trust, payable 20% cash, and the balance in the sum of $28,000.00 to be carried back in a first mortgage. "On motion duly made and carried, Henry K. Given, the President, was authorized to purchase said property, and it was and is hereby resolved that the President and Secretary of the Corporation are hereby authorized, ordered and delegated to execute any and all necessary papers to consumate [sic] all transactions." On June 25, 1945, the Columbia National Bank in Kansas City was designated in a resolution as a depository of petitioner, and an account was opened the same day in petitioner's name with a deposit of $2,500. The account will be referred to hereinafter *305 for convenience as the corporate bank account. The signature cards, which authorized LaSalle and Given to sign checks drawn against the account, contain notations that the business of petitioner was that of owner of the LaSalle building. All of the contributions of the five individuals, except the down payment of $1,000 made by Given on the purchase of the LaSalle building, were deposited in the account. The LaSalle building was conveyed to petitioner by a deed executed on June 20, 1945. The balance of $6,000 of the initial payment was paid by a check drawn on the corporate bank account, and a note, secured by a deed of trust, was executed on June 20, 1945, by petitioner for the unpaid purchase price of the property. The deed and deed of trust were filed for record on June 30, 1945. About two weeks after the purchase of the LaSalle building was completed, Given reissued the 300 shares of stock of petitioner equally among the five individuals who had contributed money to acquire the property. Given was designated by the other stockholders to manage and operate the building. Given maintained a single entry set of books to record receipts and disbursements of petitioner. The original *306 contributions of the individuals and additional amounts advanced by them for operating expenses and capital improvements were entered separate from rental receipts, except for a reimbursement in August 1946. The entries for disbursements, with a few exceptions, were supported by a check issued against the corporate bank account. At the end of each month a statement of receipts and disbursements was prepared by Given and made available to the stockholders of record. No expenses were paid from the personal bank accounts of the individuals. Among expenses paid by petitioner by check were amounts for Missouri corporate franchise tax and an antitrust affidavit. Some of the space in the LaSalle building was leased in the name of petitioner, and at least one of the leases was renewed. Checks issued for rental payments were payable to petitioner. The checks, bearing a stamp endorsement, and cash received for rent, were deposited in the corporate bank account. About May 1, 1946, Given and LaSalle purchased equally the interests of Harvey Given, Wilson and Bell. LaSalle recorded the acquisition, and the 60 shares he had received from Given, in his books as purchases of stock of petitioner. *307 On April 12, 1947, Given entered into a written contract to sell the LaSalle building. The offer to purchase was considered at a special meeting of the directors of petitioner held on the same day, and as a result, on motion of Given, seconded by LaSalle, the following resolution was adopted: "Resolved, that the offer made by Mr. P. J. Holman and Mr. Alfred Maclay for the purchase of the property in question, known as the LaSalle Building, be accepted by the corporation, and that the president and secretary be authorized and instructed to execute a deed to the property." Title to the LaSalle building was conveyed by petitioner by a deed executed on April 30, 1947. The profit realized on the sale was $36,169.45. Of the selling price of $100,738.15 for the LaSalle building, petitioner used $33,155.50 to pay liabilities, which included $5,856.30 for expenses incurred in the sale of the property, and distributed the remainder of the proceeds of sale in equal amounts to Given and LaSalle, its stockholders. Petitioner had no assets at any time after the proceeds of sale of the building were distributed, and was dissolved by operation of law on December 31, 1948. Rents received *308 from the operation of the LaSalle building were used to pay for repairs and capital improvements to and operating expenses of the building, and to make installment payments on the unpaid purchase price of the property. Given was aware that rental income and gain realized from sale of property are subject to income tax. Given and Paul White and his wife were interested in number of parcels of real property. In these transactions, the Whites contributed the purchase price for half of any profits, Given to receive the other half for locating and operating the property. One of the parcels was held in the names of straw parties and title to another one was taken in the name of a corporation, the stock of which was in Given's name. Legal services for the various corporations organized by Given, including petitioner and Bond & Share, were rendered by W. R. Waltner, an attorney in Kansas City prior to his death in 1953. The plan of operating through corporations originated with Given and was approved by Waltner. Waltner held himself out as a tax consultant. The returns filed by Given for 1947 and prior years were prepared by Waltner. An excess profits tax return for the "fiscal year *309 beginning Oct. 18, 1945, and ending Oct. 18, 1946" on Form 1121, was prepared for petitioner by Waltner from data supplied by Given. Given did not at any time give him information about the LaSalle building. The dates used for the period of the return originated with Waltner. The only transactions reported in the return were the sales of the Gumbel building and Main Street properties, as to which a net loss of $288 was shown. The return as prepared was signed by Given on July 26, 1946, as president, and was filed with the collector of the sixth district of Missouri on August 19, 1946. No return was ever filed by petitioner for rental income. On the basis of advice of Given, Waltner made a notation on the return that all of the properties of petitioner had been sold. Given did not tell Waltner anything about the LaSalle building or show him the records he kept for the property. The return contains a notation that it was reviewed in November 1948. No returns were filed by Given for the years 1945 and 1946. His return for 1947, prepared by Waltner, reported only a loss sustained in the operation of his trucking business. The return filed by Given for 1948 was prepared by Floyd E. *310 Nelson, an accountant, who in April 1948 started to keep books for Given's trucking business. Nelson was aware that Given had income from other than his trucking business but had no record of the transactions. After questioning him, Given informed Nelson that he had realized a profit of $13,000 from the sale of the LaSalle building. Nelson regarded the gain so reported to him in the return as capital gain and included $6,500 in the return as subject to tax. He did not know when he prepared the return that the property was sold in 1947 and was not shown the book containing a record of the income and expenses of the LaSalle building. Untimely returns were filed by Given on June 15, 1951, for 1949 and 1950. Revenue agent Charles R. Barrineau interviewed Given in June 1951 in connection with an investigation of tax liability of Paul and Marjorie White. Given referred Barrineau to Nelson for records of his transactions with the Whites. Barrineau first learned of petitioner and the LaSalle building from Given. He and LaSalle informed Barrineau that a search disclosed no records on the operation of the LaSalle building. LaSalle also informed him that Given had never rendered monthly statements *311 to him on the operation of the property. The only record maintained by LaSalle was on the purchase of stock of petitioner. He reported in his return for 1948 longterm capital gain from the sale of "801 Walnut St. Inc." While Barrineau was endeavoring to determine the income of petitioner from outside sources, Given engaged a certified public accountant to represent him in regard to the matter. The accountant contacted Barrineau and produced the books and records kept by Given for the operation of the LaSalle building, none of which Barrineau had previously seen. The income tax liability of petitioner involved herein was determined after an analysis by the accountant and Barrineau of the data so produced, and adjustments by Barrineau to reflect additional information obtained by him. In his determination of the deficiencies against petitioner, respondent determined that operation of the LaSalle building had resulted in taxable rental income of $3,955.87 in 1945, $17,155.80 in 1946, and $3,042.84 in 1947. The notice of deficiencies was mailed on October 31, 1952. Opinion The primary issue is the factual question of whether income earned from the operation and gain realized from *312 the sale of the LaSalle building is taxable to petitioner, as determined by the respondent. The conclusion of the respondent is opposed by the petitioners upon the ground that although petitioner was a separate entity, it held bare legal title to the building with equitable ownership in the individuals, consisting of the Givens, LaSalle, Wilson and Bell at the time of purchase, and Given and LaSalle after they acquired the interests of Harvey Given, Wilson and Bell. Regardless of the rather complicated nature of the real estate transactions conducted by Given through the medium of corporations, which, according to his testimony, were beyond the comprehension of attorneys with whom he discussed them, the part petitioner played in connection with the LaSalle building is clear from the evidence before us. The idea to purchase the property originated with LaSalle and Wilson and thereafter they and Bell and the Givens agreed to submit an offer to acquire it, each to have an equal interest. Their agreement was not reduced to writing. The negotiations to purchase were conducted by Given without disclosing all of the parties in interest. [1] After the execution of an agreement to purchase *313 with the owner, the individuals abandoned whatever plan they had to take title in their names and named the petitioner to take title. Thereafter the stockholders of petitioner adopted a resolution to purchase the property without any assertion that the corporation was acting for the benefit of others. Thereafter petitioner accepted a deed conveying title to the property to it, paid the balance due on the down payment by a check drawn on the corporate bank account, which had been opened a few days previously with contributions of the individuals as the initial deposit, and gave its note for the unpaid purchase price, secured by a deed of trust. There is nothing in the various instruments involving the sale to indicate that petitioner was acting in a fiduciary capacity of any kind. The reason is obvious from the facts here. The individuals discussed the subject of taking title showing a one-fifth interest in each but the plan was discarded because, according to the testimony *314 of Given, "There was too much risk in it." The risk, he testified, was present since "Some might die, some might go into bankruptcy, some of them might have suits against them" Testimony of LaSalle is to the same effect. The testimony of these witnesses, who are parties here as transferees, establishes that petitioner was not selected to hold bare legal title for the actual owners as a convenience; instead, it was used to avoid the personal liability that would result from holding title in their individual capacities. Lack of full powers in petitioner would have defeated the considered plan of the individuals. The survivors in interest now seek to avoid the normal result of their choice of conducting business by treating the corporate structure as a fiction for tax purposes. See Sheldon Bldg. Corporation v. Commissioner, 118 Fed. (2d) 835. Petitioner held and operated the property free of any control of the individuals, except as holders of its stock. No written agreement was entered into by the individuals with petitioner respecting the property. Title was taken by petitioner, after appropriate corporate action, as absolute owner, and it operated the property as such. *315 The bank account was in petitioner's name and withdrawals therefrom were subject to checks signed only by individuals designated as officers of the corporation. As additional money was required to make repairs and capital improvements, petitioner borrowed funds from the individuals, who held its stock, and repaid the amounts as loans. There is testimony that the stock of petitioner was issued to the individuals by Given merely to give them evidence of their point ownership of the building. Such testimony must be viewed in the light of the plan for corporate ownership and operation to avoid personal liability. The fact that the stock was reissued out of the holdings of Given, the sole beneficial stockholder of petitioner, is not important. The record is replete with evidence illustrative of the informal and indifferent manner in which he conducted business activities. At the time of the reissuance of stock, petitioner had disposed of all of its assets except the LaSalle building and one other parcel, which was on the market for sale at the time and was sold on August 22, 1945, with the proceeds committed to pay indebtedness to Bond & Share. Thereafter petitioner had no assets other *316 than the LaSalle building. Thus, Given sustained no loss by sharing his stock ownership with his associates. The records maintained by LaSalle and his return for 1948 disclose that prior to the time the present question arose he considered himself to be a stockholder of petitioner and not, therefore, as he now contends, the beneficial owner of an interest in the building in his individual capacity. Consideration of all of the evidence leads to the conclusion that respondent committed no error in taxing petitioner on the income derived from operating the LaSalle building and the gain realized from the sale of the property. The parties stipulated that gain of $36,169.45 was realized during the taxable period ended May 31, 1947, from the sale of the LaSalle building, as determined by the respondent. The respondent also found that certain amounts, as set forth in our findings, were derived from rental of the building. The determinations so made are sustained in the absence of proof of error. There is no disagreement on the amount of gain realized in 1945 from the sale of the Gumbel building and the three parcels located on Main Street. Counsel for petitioner not only did not specifically *317 include the taxability of this gain in his statement of the issues for decision in spite of the effort made by the Court to clarify the points of difference between the parties, but gave the impression that the only gain still in controversy related to the LaSalle building. Given, who was in a position to know for whose account the properties were sold for tax purposes, testified that the assets belonged to petitioner and that the trans-actions should have been included in its return. [2] Other facts support the determination of respondent that the gain was income of petitioner. The only contention being made by petitioner on brief is that the form filed on August 19, 1946, was a return which started the running of the statute of limitations and in the absence of fraud, assessment of any deficiency for 1945 is barred. No such question was raised by the pleadings. Issues raised for the first time on brief can not be considered. Accordingly, the action of respondent in taxing the gain to petitioner is sustained. The *318 respondent added to the deficiency each taxable period a penalty of 25 per cent under the provisions of section 291(a), Internal Revenue Code of 1939, because of failure of petitioner to file an income tax return on Form 1120 within the time prescribed by law. His action must be sustained unless there is proof that the failure was "due to reasonable cause and not due to willful neglect." The contention of petitioner in general is that a return was filed, and if it does not meet the requirements of the statute, reliance upon advice of Waltner is sufficient to avoid the penalties imposed for each taxable period. No proof was made that petitioner's accounting period was other than a calendar year, as determined by the respondent in his deficiency notice, [3] and petitioner does not expressly contend otherwise. See section 41(g), Internal Revenue Code of 1939. The evidence is devoid of any proof that petitioner filed a return for any of the taxable years for which the deficiencies were determined. The only return filed was a return for excess profits tax on Form 1121 for a fiscal year beginning October 18, 1945, and ending October 18, 1946. Such an accounting period is not recognized *319 by the statute and respondent properly rejected it as a basis for reporting tax liability. Parks-Chambers, Inc., 46 B.T.A. 144, affirmed 131 Fed. (2d) 65. The manner in which Waltner prepared the only form of return filed by petitioner is sufficient to establish his lack of competency to properly advise clients on matters of income tax liability, including the statutory requirements for filing returns. If there was proof of Waltner's qualifications, petitioner's case would neverthless fall on the grounds relied upon. Given, who was in complete charge of the operations of petitioner, never disclosed anything to Waltner about the LaSalle building and no proof was made that he had knowledge of it from any other source. Such failure discloses lack of ordinary care and prudence in the matter and supports the determination of respondent. Tarbox Corp., 6 T.C. 35; 1040 Springfield Avenue Corporation v. Commissioner, 185 Fed. (2d) 406. On this issue respondent is sustained. Respondent *320 seeks to sustain his allegation of fraud solely upon the intent of Given with respect to the income derived from the LaSalle building while acting as an officer of petitioner. There is some evidence that creates suspicion of a fraudulent intent to evade tax, among which is the failure of Given to inquire of Waltner, whom he consulted on matters of income tax, whether petitioner was required to file income tax returns reflecting the transactions of the building and his failure to produce the records he kept for the corporation when first consulted by the revenue agent. More than mere suspicion is required. The proof must be clear and convincing. The evidence pointing to fraudulent intent is at least counterbalanced by other facts. There is testimony in the record of other than Given and LaSalle, who are interested parties, that the individuals believed that they were the beneficial owners of the building and were operating it as such, with the petitioner serving them in no greater capacity than as a straw party for record purposes, and, therefore, not liable for tax on income. Given concluded that petitioner had no taxable income from rent because expenditures exceeded receipts. *321 His failure to treat some of the expenditures as payments for capital improvements, nondeductible in computing taxable net income, or consult others competent to determine the matter, constitutes indifference amounting to negligence, but is not enough to establish fraud. We are not persuaded that Given's report that books of account could not be located was a willful effort to conceal evidence of the corporation's activities. Thereafter the books of account were presented by an accountant employed by Given to represent petitioner, and they formed the basis for the deficiencies involved herein. Further discussion of the evidence appears unnecessary. It is sufficient that from a consideration of all of the facts we are unable to conclude that respondent sustained his burden of proof. Accordingly, the fraud issue is decided in favor of petitioner. Conclusions already reached render unnecessary any discussion under the remaining issue as to absence of liability of Given and LaSalle as transferees because of alleged expiration of the statutory period for assessment and nontaxable status of petitioner. Given concedes that he was a stockholder of petitioner respecting the gain realized *322 from the sale of the Gumbel building and Main Street properties but asserts as to transferee liability for unpaid tax on such income that respondent has failed to show the amount received by him as a stockholder of Bond & Share, the alleged distributee of the proceeds. LaSalle asserts that he is not liable as a transferee with respect to such transactions because he was not a stockholder of Bond & Share. Concerning the unpaid tax on the gain realized from the sale of the LaSalle building, Given and LaSalle each contends that he received a share of the proceeds of sale as a beneficial owner and not as a stockholder of petitioner. The proceeds of sale of the Gumbel building and Main Street properties were paid to Bond & Share to satisfy obligations to it for loans and not to it as a stockholder of petitioner. LaSalle did not become a stockholder of petitioner until about the time of the sale of all of the corporate assets, excluding the LaSalle building, but at the time of the sale of the LaSalle building he and Given owned all of the stock of petitioner in equal amounts. The sale of the LaSalle building and the distribution of the proceeds left petitioner without assets and it *323 was dissolved at the close of 1948 by operation of law. LaSalle and Given each received, as stockholders, $33,791.32 from petitioner out of the proceeds of the sale of the LaSalle building. Clearly, each is liable as a transferee for unpaid tax of petitioner to the extent of the final distributions made to them, and we so hold. Decisions will be entered under Rule 50. Footnotes
1. His offer to purchase was signed as president of Bond & Share and the contract to purchase entered into on June 6, 1945, was signed in his individual capacity without disclosing his actual interest.↩
2. The sales were reported by petitioner in a return for a fiscal year shown as ending October 18, 1946, a period after all of the sales were admittedly made.↩
3. The de facto dissolution of petitioner in 1947 accounts for the taxable period of less than twelve months used by the respondent in that year.↩